## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| BRITTANY C. WHITE, | ) | Case No. 17-00102-TOM-13 |
| | ) | |
| Debtor. | ) | |

___

## MEMORANDUM OPINION

This case came before the Court on April 10, 2017, for trial[1] on the Motion for Relief from the Automatic Stay filed by Charlie, Inc. d/b/a Serra Hyundai, the Debtor's Opposition to Motion for Relief from Stay, confirmation of the Debtor's Chapter 13 Plan, the Objection to Confirmation of Debtor's Chapter 13 Plan filed by Charlie, Inc. d/b/a Serra Hyundai, and the Debtor's Response to Objection to Plan. Appearing before the Court were Randall D. Quarles, Fran Quarles, and William Gregory Biddle, attorneys for the Debtor; Jeffrey L. Ingram and David A. Butler, attorneys for Charlie, Inc. d/b/a Serra Hyundai; Mary Frances Fallaw, attorney for the Chapter 13 Trustee; Brittany White, Debtor; and Dr. Steven B. Hefter, and Christopher Cone, witnesses.[2] This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151, and 157(a) and the District Court's General Order of Reference Dated July 16, 1984, as Amended July 17, 1984.[3] This is a core proceeding arising under Title 11 of the United States Code as defined in 28 U.S.C. §

---

[1] Based on no written objections having been filed and no verbal objections having been voiced at any hearings in this matter, all parties and their counsel have implied their consent and thus will be deemed to have consented to entry by the Bankruptcy Court of any and all final orders and judgments in this matter.

[2] At trial Serra called Yolanda Williams, the Collection Supervisor for Regional Acceptance, to testify. Counsel for Ms. White objected because Ms. Williams had not been identified correctly on the witness list submitted to the Court before trial. This Court sustained the objection and Ms. Williams did not testify.

[3] The General Order of Reference Dated July 16, 1984, As Amended July 17, 1984 issued by the United States District Court for the Northern District of Alabama provides:
>The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

157(b)(2)(G) and (L).[4] This Court has considered the pleadings, arguments of counsel, the testimony of witnesses, the exhibits, and the law, and finds and concludes as follows:[5]

## **FINDINGS OF FACTS**[6]

The dispute between Ms. White and Charlie, Inc., d/b/a Serra Hyundai ("Serra") stems from the purchase of a Hyundai Sonata (the "Sonata") by Ms. White and Dr. Steven Hefter from Serra. In sum, Serra alleges that financing for the purchase fell through due to fraudulent misrepresentations made by Ms. White and Dr. Hefter in connection with the purchase regarding employment and income. Serra argues that in accordance with the terms of the purchase documents, Ms. White is obligated to return the Sonata to Serra. She denies the allegations and seeks to retain the Sonata.

Ms. White filed her bankruptcy case on January 10, 2017. On January 27, 2017, Serra filed its Motion for Relief from the Automatic Stay and Ms. White objected on February 15, 2017. In her Chapter 13 Plan filed March 3, 2017 that is now before this Court for confirmation, she proposes that she will make payments to the Chapter 13 Trustee in the amount of $825 per month. The Plan also proposes that the $19,769 debt to Serra will be paid as a secured debt with interest accruing at the rate of 5% per year through monthly payments of $410 to be paid from the Chapter 13 Trustee, beginning in August 2017.[7] Ms. White testified that she had made three payments to

---

[4] 28 U.S.C. §157(b)(2)(A) provides as follows:
  (b)(2) Core proceedings include, but are not limited to–
    …
    (G) motions to terminate, annul, or modify the automatic stay;
    . . .
    (L) confirmations of plans[.]

[5] This Memorandum Opinion constitutes findings of facts and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to contested matters in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Bankruptcy Procedure 9014.

[6] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files. *See ITT Rayonier, Inc. v. U.S.*, 651 F.2d 343 (5th Cir. Unit B July 1981); *Florida v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975).

[7] The Plan now before the Court, dated March 2, 2017, was not the first plan proposed by Ms. White. For reasons unknown, the original plan filed January 10, 2017, did not provide for the debt to Serra at all. The current Plan

the Trustee as of the time of trial.[8] Serra filed its Objection to Confirmation of Debtor's Chapter 13 Plan on March 14, 2017, and Ms. White filed her response the same day.

At trial on April 10, 2017, Ms. White testified about her employment status and income. According to her testimony, Ms. White is a lab technician who has worked in the office of Dr. Steven Hefter for approximately 5 years. Ms. White explained that while she works at the direction of Dr. Hefter, she is not actually employed by him; she was placed in his office through a staffing service. Ms. White testified that at the time she began working in Dr. Hefter's office she was considered an employee of the staffing office and her income was reported on a W-2. She further testified that around April 2016 changes were made at the staffing service and she became an independent contractor whose income was reported on a 1099 form. While Ms. White went from being an employee to an independent contractor, her placement in Dr. Hefter's office remained unchanged.

Ms. White testified that it is necessary for her to have reliable transportation since she is a single mother whose children attend school and participate in extra-curricular activities, and she travels to Dr. Hefter's offices in three different Alabama cities every week. She does not believe she can keep her job without reliable transportation. Ms. White explained that she went to Serra to purchase a vehicle because Dr. Hefter had recently purchased a vehicle there. She completed the paperwork to finance the purchase of the Sonata from Serra for the total price of $21,499 to be repaid with interest accruing at a rate of 14.95%.[9] *See* Serra's Exs. 7 and 22. Dr. Hefter was involved in this transaction as well; in fact, he completed the credit application (the "Credit

---

indicates that $419 of the total debt is unsecured but still provides that the entire debt will be treated as secured since it is a "910 day claim," or in other words, was purchased within 910 days prior to the bankruptcy filing date. *See* 11 U.S.C. 1325(a).

[8] The Court took judicial notice of the Chapter 13 Trustee's Interim Statement dated March 31, 2017, showing two payments received by the Trustee. Also introduced into evidence was a receipt from ServisFirst Bank showing a payment on April 7, 2017 that was not yet reflected on the Trustee's Interim Statement. *See* White's Ex. HH.

[9] Ms. White testified that she made a $1,000 down payment and $2,500 in rebates were applied to the purchase.

3

Application") as the primary applicant while Ms. White applied as the co-applicant. *See* Serra's Ex. 6. According to Dr. Hefter's testimony, Ms. White had asked him to cosign for the Sonata. There was no testimony as to whether Serra required Ms. White to have a cosigner or if Dr. Hefter was asked to cosign for a different reason.

In order to purchase the vehicle, Ms. White and Dr. Hefter had to provide certain financial information to Serra. In Ms. White's Credit Application, she indicated she was employed by "Matrix Life Science Clinicalab" and had been for 4 years and 2 months. She listed her salary as $5,000 per month. *See* Serra's Ex. 6. Notably, the form does not specify whether gross or net salary should be disclosed. Ms. White testified that although she had disclosed she was a "1099 employee" to both the salesman and Christopher Cone, the finance manager, before she signed the documents to purchase the vehicle, the salesman from Serra later called to inform her that he had misunderstood and did not realize she was a "1099 employee." The salesman had told her to return to the dealership to sign an affidavit to that effect, which she did. She stated she had given Serra copies of her paychecks as well as contact information for someone at the staffing agency so that her income could be verified. At trial, counsel for Serra emphasized discrepancies between the Credit Application and Ms. White's bankruptcy schedules. In the Credit Application she indicated that she was employed with a salary of $5,000 per month. However, on Schedule I, she revealed that she was self-employed with a net business income of $4,000 per month. On the "means test"[10] she reported gross business income of $5,000 per month less $1,000 for "[o]rdinary and necessary operating expenses," leaving a net income of $4,000. *See* Serra's Ex. 27.

With regard to the purchase transaction, Dr. Hefter testified that he first filled out an online application then physically signed the Credit Application at Serra. He indicated on both the online

---

[10] The form commonly referred to as the "means test" is entitled Chapter 13 Statement of Your Current Monthly Income and Calculation of Commitment Period.

4

application and the Credit Application that he was the CEO of Lifegroup, LLC, with a salary of $20,000 per month. In connection with the purchase Dr. Hefter had provided to Serra a document referred to at trial as a "monthly income statement" for his office (the "Income Statement"), which reflected that his business received a "12 Month Net Volume" of $226,836 in receipts, which he testified is an average of $18,900 per month. *See* White's Ex. CC. According to Dr. Hefter's testimony, his office expenses including rent, utilities, phone, internet, and supplies are paid from these receipts, as well as the wages he pays his two employees. He also testified that he does not pay Ms. White at all; her wages are paid through the staffing agency.[11] Dr. Hefter explained that he does not receive a paycheck from the practice. When he has a personal expense to pay, he transfers money to his personal account and that money is counted as income. In addition, Dr. Hefter testified that he receives additional income officiating at sporting events, although he breaks even after taking expenses into account, and driving for Uber, from which he made approximately $18,400 in 2016. He testified that this additional income was not included on the documents he submitted to Serra. At trial, Serra introduced into evidence Dr. Hefter's tax returns for 2014 and 2015, which he testified were given to Serra prior to the completion of the sale and prior to Ms. White taking possession of the car. The tax returns reveal that he had total income of $85,947 in 2014 and $117,977 in 2015. *See* Serra's Exs. 16 and 15. Upon questioning, Dr. Hefter admitted he personally received less than $20,000 per month from his medical practice. However, he testified that he did not intend to defraud or mislead Serra, and that he "supplied them everything they needed." Dr. Hefter testified that he had previously purchased a total of five Hyundai automobiles including the one he bought in August 2016 and excluding the one he purchased with Ms. White. Dr. Hefter further testified that he had never had a vehicle repossessed.

---

[11] Presumably Dr. Hefter pays the staffing agency for Ms. White's services out of these receipts as well but this point was not clearly established through testimony or other evidence.

5

In addition to providing financial information to Serra and signing related documentation, Ms. White and Dr. Hefter signed several other documents as part of the purchase transaction, such as an Application for Certificate of Title for the 2016 Hyundai Sonata listing Ms. White and Dr. Hefter as the owners and Regional Acceptance as first lienholder.[12]  *See* Serra's Ex. 22.  Another document, entitled "Retail Buyers Order," reflected the sales price, the fees charged, the down payment amount, and the total amount due for the Sonata.  Page two of the Retail Buyers Order contains the following provision:

> III.  BAILMENT AGREEMENT
> If the vehicle described on the front of this buyers order was purchased on an installment payment plan, this vehicle is being delivered PENDING FINANCIAL APPROVAL, by lender or lenders as a convenience to the buyer or buyers, and is subject to all terms and agreements of the said contract.  The Seller has all the rights to the said vehicle until the loan term and conditions have been approved by the lender or lenders.  Upon loan denial or condition approval to which the purchaser cannot conform to the condition, Purchaser(s) shall promptly (within 24 hours of loan denial) return said vehicle to the Seller in the original condition.  Purchaser(s) shall be liable for any damage, destruction, or abuse to the said vehicle until inspected by the Seller.  Therefore, <u>I UNDERSTAND THAT THIS VEHICLE IS BEING DELIVERED SUBJECT TO FINANCIAL APPROVAL.</u>

Serra's Ex. 7 (emphasis in original).  Another document signed by both Ms. White and Dr. Hefter is entitled "Delivery Receipt" and provides, in relevant part:[13]

> IF A RETAIL INSTALLMENT CONTRACT IS EXECUTED AS PART OF THIS SALES TRANSACTION, THEN BUYER AND SELLER INTEND THAT THIS CONTRACT WILL BE ASSIGNED BY SELLER.  IN THE EVENT SELLER IS UNABLE TO ASSIGN THIS CONTRACT WITHIN _____ DAYS OF THE DATE HEREOF, THIS CONTRACT SHALL BE NULL AND VOID AND BUYER, IMMEDIATELY UPON NOTICE BY SELLER, SHALL DO ONE OF THE FOLLOWING:
> 1. PURCHASE THE VEHICLE FROM SELLER FOR THE CASH PRICE THEREOF SET FORTH HEREIN; OR

---

[12] The Certificate of Title for a Vehicle attached to Serra's Proof of Claim filed in Ms. White's bankruptcy case indicates that Charlie Inc. is the first lienholder.  *See* BK 17-00102, Claim 3 filed by Charlie, Inc. d/b/a Serra Huyndai.

[13] The remainder of the Delivery Receipt addresses a situation where no retail installment contract was executed and is therefore inapplicable to this case.

6

>   2.  RETURN THE VEHICLE DESCRIBED HEREIN TO SELLER AND
>   PAY TO SELLER THE COST OF REPAIR OR ANY DAMAGE OCCURRING
>   TO THE VEHICLE WHILE IN BUYER'S POSSESSION.

White's Ex. W. The space for indicating how many days Serra would have to assign the contract before the vehicle had to be returned was left blank. Christopher Cone, finance manager at Serra, testified that at the closing he explained that the Delivery Receipt was a "receipt for taking delivery of the car" even though that is not what is reflected on the document because that was what he was trained by Serra to say.

Mr. Cone testified that it is his job to process and complete paperwork to send to the potential lenders or financial institutions. He explained that credit applications are submitted online through a program called "Dealertrack." In the case of Ms. White and Dr. Hefter, only one lender out of seven, Regional Acceptance, approved the credit application. *See* Serra's Ex. 2. According to Mr. Cone, Regional Acceptance's approval was conditioned on certain stipulations being satisfied, including proof of income, proof of residence, and references; however, because Dealertrack gave the transaction a "green check," he believed there was a deal for financing and thus entered into the sales contract with Ms. White and Dr. Hefter before any documents were forwarded to Regional Acceptance. He stated he believes it was reasonable for Ms. White and Dr. Hefter to assume that Regional Acceptance would finance the purchase.

Mr. Cone explained that bank statements, pay stubs, and tax returns were submitted to Regional Acceptance, and sometime thereafter, Serra received a letter from Regional Acceptance advising that it would not purchase the contract. Mr. Cone testified that Regional Acceptance rejected the Credit Application because the information contained therein did not match the documents submitted to it. He contends that after Regional Acceptance declined to finance the

7

purchase Serra tried to obtain financing through others; however, he has not seen any record of the Credit Application being submitted to any other lenders.

Ms. White testified that she knew the purchase was contingent on receiving financing, but she had been told the financing was approved and believed the sale was final. However, around three weeks after she took possession of the Sonata, Greg Henson from Serra called to inform her that financing had not been approved and the Sonata had to be returned. According to Ms. White, she never received any written notice that the financing was not approved, and no one from Serra offered to refund her down payment. She admitted that she originally said she would return the car but decided "to make sure that what they were doing was legal."[14] Ms. White asserts that she wants to keep the Sonata and has the means to pay for it. Mr. Quarles, counsel for Ms. White, introduced into evidence two checks dated November 4, 2016, and December 6, 2016, each in the amount of $420.05, which were drawn on his trust account and sent to counsel for Serra for the November and December payments. According to Mr. Quarles, the checks were never negotiated and the money remains in his trust account.

In response to questions regarding her care of the Sonata, Ms. White testified that she has insurance on the car with Progressive, which she obtained prior to driving off of the lot. Serra is listed on the policy as the lienholder. Ms. White explained that she had been involved in an accident in which someone hit her, scratching the bumper of the Sonata. She testified that it will cost $2,200 to replace the bumper, and that she has not yet had the repairs made because she is waiting to find out whether or not she will be able to keep the car.

---

[14] According to Serra's Objection to Confirmation of Debtor's Chapter 13 Plan, Ms. White and Dr. Hefter filed suit against Serra in the District Court for the Northern District of Alabama, case no. 2:16-cv-1805-RDP, in which they sought a temporary restraining order and preliminary injunction. *See* BK 17-00102, Doc. 41. After an unsuccessful mediation attempt, the district court set a hearing on the motion for January 11, 2017. Ms. White filed her bankruptcy case in advance of the hearing, on January 10, 2017.

# CONCLUSIONS OF LAW

OBJECTION TO CONFIRMATION

Bankruptcy Code § 1325(a) provides, in relevant part, that a Chapter 13 plan shall be confirmed by a court if:

> (a)(3) the plan has been proposed in good faith and not by any means forbidden by law; [and]
> . . .
> (7) the action of the debtor in filing the petition was in good faith[.]

11 U.S.C. § 1325(a)(3), (7). Since "good faith" has not been defined within the Bankruptcy Code, the Eleventh Circuit Court of Appeals has compiled a list of non-exclusive factors, known as the "*Kitchens* factors," to be considered by a court when examining good faith. *In re Lott*, No. 10-06061-TOM-13, 2011 WL 1981740, at *4-5 (Bankr. N.D. Ala. May 23, 2011) (Mitchell, J.) (citing *Kitchens v. Ga. R.R. Bank and Tr. Co. (In re Kitchens)*, 702 F.2d 885, 888-89 (11th Cir. 1983)). The *Kitchens* factors include:

> "(1) the amount of the debtor's income from all sources; (2) the living expenses of the debtor and his dependents; (3) the amount of attorney's fees; (4) the probable or expected duration of the debtor's Chapter 13 plan; (5) the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13; (6) the debtor's degree of effort; (7) the debtor's ability to earn and the likelihood of fluctuation in his earnings; (8) special circumstances such as inordinate medical expenses; (9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act and its predecessors; (10) the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealings with his creditors; (11) the burden which the plan's administration would place on the trustee."

*Lott*, 2011 WL 1981740, at *5 (quoting *Kitchens*, 702 F.2d at 888-89). Other factors include:

> "[T]he extent to which claims are modified," "the extent of preferential treatment among classes of creditors," the "substantiality of repayment to unsecured creditors," "whether [a] debt would be nondischargeable under Chapter 7," and the "accuracy of the plan's statements of debts and expenses and whether any inaccuracies are an attempt to mislead the court."

9

*Lott*, 2011 WL 1981740, at *5 (quoting *Kitchens*, 702 F.2d at 889). There are two *Kitchens* factors in particular that have been cited by Serra in its argument that Ms. White's plan was not proposed in good faith and should not be confirmed: "the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealings with his creditors," and "whether [a] debt would be nondischargeable under Chapter 7." *See* Doc. 41.

Serra contends that Ms. White did not deal with Serra in good faith because Ms. White and Dr. Hefter made false representations on the documents submitted regarding their finances. Only Ms. White is a debtor in this case so only her good faith in dealing with Serra is relevant. There is no evidence before the Court that Ms. White instructed or encouraged Dr. Hefter to misstate his income or otherwise provide false information to Serra, if in fact he did. Serra argues that Ms. White misstated her income on the Credit Application by indicating she has a salary of $5,000 per month since her bankruptcy schedules reflect an income of $4,000 per month. The bankruptcy schedules are not in conflict with the Credit Application. Ms. White reported on her schedules that she has business income of $5,000 per month and a net income of $4,000 per month once expenses are deducted. The Credit Application completed by Ms. White asked for her "salary," not "gross salary" or "net salary." A customer should not have to guess what information is being sought in an application. The Court cannot conclude that Ms. White had any intent to misrepresent her income by disclosing her gross income on the Credit Application.

Serra also contends that Ms. White misrepresented her employment status. Ms. White indicated on the Credit Application that she was employed and had been at the job for four years and two months, which was the time that she had been working in Dr. Hefter's office under his supervision at that point. It was not unreasonable for Ms. White to indicate that she had held the same position for a certain length of time although her employment status had technically changed.

10

It does not appear that Ms. White had sufficient space on the Credit Application to explain the circumstances of her employment or self-employment. Not all answers can be neatly condensed into one or two small boxes to be checked on an application. From the evidence presented to this Court it appears that at the time Ms. White completed the Credit Application she submitted proof of her income, from which Serra could have ascertained the information that it now contends she misrepresented. Further, Ms. White testified that she believed financing had been approved when she left the dealership with the Sonata. In fact, Mr. Cone of Serra testified that he believed financing to have been approved at that time. Serra implies in its Objection to Confirmation that Ms. White acted in bad faith by filing a suit in district court then filing her bankruptcy case. There is nothing inherently wrong with Ms. White filing a suit in district court to determine her rights as to the Sonata. Furthermore, bankruptcy cases are filed every day by debtors who attempt to retain possession of a vehicle, and Ms. White's case is no different. From the testimony and other evidence presented, this Court concludes that Ms. White acted in good faith in her dealings with Serra.

The other *Kitchens* factor raised by Serra involves whether a debtor's debts would be discharged in a Chapter 7 case. Serra looks to Bankruptcy Code § 523(a)(2), which in effect excludes from a Chapter 7 discharge a debt for property obtained by fraud.[15] This Court has

---

[15] 11 U.S.C. § 523(a)(2) provides in relevant part:

  (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
    . . . .
  (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
    (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
    (B) use of a statement in writing—
      (i) that is materially false;
      (ii) respecting the debtor's or an insider's financial condition;
      (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

11

concluded that Ms. White did not provide false information on her Credit Application; thus, this factor does not support denial of confirmation.[16]

Serra also argues that the Plan proposed by Ms. White does not provide adequate protection for Serra's risk of loss associated with the debtor. The Plan provides that the debt will be repaid in full as a secured debt with 5% interest. Admittedly the interest rate proposed is lower than the rate originally contemplated in the loan documents, but debtors before this Court routinely "cram down" interest rates on vehicle loans to make payments more affordable while still protecting the secured creditor. *See Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S. Ct. 1951, 158 L. Ed. 2d 787 (2004). The lower interest rate is not indicative of a lack of good faith. Further, Serra offered no testimony or other evidence that the proposed interest rate was unreasonable.

The arguments advanced by Serra do not support denial of confirmation. Objections to confirmation have not been raised by any other creditor or the Chapter 13 Trustee. The Court finds that the Plan proposed by Ms. White satisfies the requirements of section 1325 and is thus due to be confirmed.

MOTION FOR RELIEF FROM STAY

Serra contends that it is entitled to relief from the automatic stay under Bankruptcy Code § 362(d)(1) and (2) so that it may repossess the Hyundai. This section provides:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--
>   (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>   (2) with respect to a stay of an act against property under subsection (a) of this section, if--
>     (A) the debtor does not have an equity in such property; and
>     (B) such property is not necessary to an effective reorganization[.]

---

(iv) that the debtor caused to be made or published with intent to deceive[.]

[16] Whether or not the debt owed to Serra would be dischargeable, either in a Chapter 13 or a Chapter 7, is not before the Court.

Case 17-00102-TOM13    Doc 57    Filed 05/18/17    Entered 05/18/17 15:32:53    Desc Main
Document      Page 12 of 16

11 U.S.C. § 362(d)(1)-(2). "The movant must carry the initial burden of establishing a prima facie case for relief under § 362(d)(1) and/or (2) before the burden of proof shifts to the debtor. . . . Once the movant establishes sufficient evidence of its prima facie case for relief, the debtor has the burden of proof on all issues other than his equity in the collateral under § 362(d)(2)." *In re Powell*, 223 B.R. 225, 232 (Bankr. N.D. Ala. 1998) (citations and footnotes omitted).

As an initial matter, Serra has argued that the Hyundai is not property of the estate. Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541; *see also Charles R. Hall Motors, Inc. v. Lewis (In re Lewis)*, 137 F.3d 1280, 1283 (11th Cir. 1998). Although "whether a debtor's interest constitutes 'property of the estate' is a federal question . . . 'the nature and existence of the [debtor's] right to property is determined by looking at state law.'" *Lewis*, 137 F.3d at 1283 (quoting *Southtrust Bank of Alabama v. Thomas (In re Thomas)*, 883 F.2d 991, 995 (11th Cir. 1989)). In Alabama, "the manner in which a vehicle is titled is prima facie evidence of ownership." *Carolina Cas. Ins. Co. v. Williams*, 945 So. 2d 1030, 1034-35 (Ala. 2006) (citing Ala. Code § 32-8-39(d)). However, the presumption of ownership is rebuttable. *Williams*, 945 So. 2d at 1035 (citing *Ranger Ins. Co. v. Whitlow*, 514 So. 2d 1338 (Ala. 1987)).

In *Rutledge v. Toyota Motor Credit*, 155 B.R. 344 (Bankr. N.D. Ala. 1990), the bankruptcy court concluded that the debtor had an equitable interest in a car even though the car was purchased in her father's name and her father was listed as the owner on the certificate of title. *Id*. at 344-45. When the car was purchased, the debtor traded in another car and made a down payment on the new car. *Id*. at 344. The debtor obtained an insurance policy listing her as the insured and made payments on the car by check drawn on her bank account. *Id*. at 344-45. After some time the car was refinanced, still in her father's name, although the debtor continued to make the payments.

13

*Id*. at 355. In reaching its decision, the court noted that although the father was named as the owner of the car on the certificate of title, the car the other facts of the case established that the debtor had at least an equitable interest in the car and thus the car was property of her bankruptcy estate. *Id*. at 346.

In the case before this Court, both Ms. White and Dr. Hefter are listed as owners on the certificate of title and are therefore the presumptive owners of the Hyundai. *See* Doc. 41, Ex. K, State of Alabama Certificate of Title for a Vehicle; *see also* White's Ex. J, Application for Certificate of Title. The facts presented to this Court further indicate that Ms. White has an ownership interest in the Hyundai according to *Rutledge*. Ms. White made a down payment on the Hyundai and obtained insurance naming Serra as loss payee. Furthermore, Ms. White has attempted to make payments to Serra drawn on her attorney's trust account, and has proposed in her Chapter 13 plan to pay the entire balance due on the Hyundai through the Chapter 13 Trustee within 60 months. The Court concludes that Ms. White has a sufficient ownership interest in the Hyundai that it became property of the estate, and thus protected by the automatic stay, when she filed her bankruptcy petition.

Now that it has been established that the Hyundai is property of the estate, the Court must examine whether Serra is entitled to relief from the stay pursuant to either § 362(d)(1) or § 362(d)(2). "Whether cause exists to grant stay relief [under § 362(d)(1)] must be determined on a case by case basis based upon the totality of the circumstances in each particular case. . . . The totality of the circumstances of a case encompasses, among other things, how the parties have conducted themselves, their good or bad faith, and their motives." *In re Mack*, 347 B.R. 911, 915 (Bankr. M.D. Fla. 2006). Serra has alleged that cause exists to lift the automatic stay because, among other things, Ms. White obtained the Hyundai by fraud, has no agreement allowing her to

14

pay for the Hyundai over time, and has no insurance policy protecting Serra's interest in the Hyundai. However, as already explained, Serra has not established that Ms. White obtained the Hyundai through fraud. Ms. White has proposed to pay for the Hyundai in full through her bankruptcy case and has tendered payments, drawn on her attorney's trust account, which Serra has thus far refused. Ms. White has testified that she has the Hyundai insured with Serra listed on the policy as loss payee. The totality of the circumstances in this case indicates that Ms. White acted in good faith in purchasing a vehicle from Serra and believing that she had a financing deal in place. There is no evidence indicating that Ms. White intends to pay less than the full purchase price of the Hyundai or that she will not keep the vehicle insured and in good condition. Serra has not established that cause exists under § 362(d)(1) for relief from the stay to be granted.

For Serra to obtain relief from the stay under § 362(d)(2), it is not sufficient for Serra to establish either that Ms. White lacks equity in the Hyundai, or that the Hyundai in not necessary for an effective reorganization. *See In re Dial*, No. 10-01330-TOM-13, 2011 WL 5325607, at *3 (Bankr. N.D. Ala. Nov. 3, 2011). Both of these prongs must be fulfilled before relief under this subsection may be granted. *Id*. "For property to be 'necessary to an effective reorganization' of the debtor, within the meaning of § 362(d)(2)(B), it must be demonstrated that an effective reorganization is realistically possible; the mere fact that the property is indispensible to the debtor's survival is insufficient." *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 673 n.7 (11th Cir. 1984).

The question of equity may be disposed of quickly. Ms. White purchased the Hyundai new, and while she did make a down payment of $1,000, and rebates of $2,500 were applied to the purchase price, no payments have been credited to the purchase since that time. With regard to the other prong of § 362(d)(2), Ms. White's continued possession of the Hyundai is necessary

15

for her to successfully reorganize. She is a single mother with active children and a job that requires her to travel to three cities each week. She needs dependable transportation. It appears that the Chapter 13 plan proposed by Ms. White is feasible and that an "effective reorganization is realistically possible." Ms. White testified that she had made three payments to the Trustee as of the time of trial. Neither the Trustee nor any creditor other than Serra has objected to the plan, and as this Court has already explained, the plan is due to be confirmed. Neither prong of § 362(d)(2) has been established and thus relief from stay under this section is due to be denied.

For the reasons stated herein, Serra's Objection to Confirmation is due to be overruled, Serra's Motion for Relief is due to be denied, and Ms. White's Chapter 13 Plan is due to be confirmed. A separate order in conformity with this Memorandum Opinion will be entered, as well as a separate order confirming Ms. White's Plan.

Dated: May 18, 2017 /s/ Tamara O. Mitchell
TAMARA O. MITCHELL
United States Bankruptcy Judge

TOM/dgm

16